UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. S1-4:21-cr-00532-SEP-SRW |
| ) | |
| CHRISTOPHER CARROLL, et al. ) | |
| ) | |
| Defendants. ) | |

**<u>DEFENDANT'S SENTENCING MEMORANDUM</u>**

COMES NOW Defendant Chris Carroll, through counsel, and respectfully submits the following information for the Court's consideration related to Mr. Carroll's upcoming sentencing:

The Government has worked very hard to paint a picture of Mr. Carroll as a very evil man. While making no attempt to minimize the charges of which he was convicted, Defendant hopes the Court takes note of the Government's unnecessarily hostile attitude towards Mr. Carroll and its resulting overstatement of many "facts." At the end of the trial, when this Court was determining whether to commit Mr. Carroll to immediate custody, Government counsel claimed on the record that Mrs. Carroll would be better off without him. At George Reed's sentencing, Government counsel claimed George Reed's "financial ruin was solely because of Mr. Carroll." Then, relating to Mr. Carroll, the Government provided the Probation Office with many "facts" that it later withdrew from advocating, after undersigned counsel pointed out they were simply untrue. *See* Doc. 485.

As is demonstrated by the collection of letters in support that accompany this Memorandum, *see* Exhibit 1, there is clearly much about Mr. Carroll the Government does not

1

know. Mr. Carroll's life and worth cannot and should not be defined only by the regrettable facts which bring him before the Court.

In accordance with the calculations prepared by the United States Probation Office, the applicable Total Offense Level under the Sentencing Guidelines would be 28, with an advisory imprisonment range of 87-108 months. While we note that the Government and Defendant disagree about the proper Guidelines range (addressed further below), we acknowledge that even our calculations still provide a range of over 60 months. The law is clear that "[t]he court shall impose a sentence sufficient, **but not greater than necessary**, to comply with the purposes set forth in paragraph (2)." 18 U.S.C. § 3553 (emphasis added)  Under either version of the Guidelines calculations, we are seeking a significant downward variance from the Guidelines range.

We fully recognize that the Guidelines range is significant.  But the life issues for Mr. Carroll and particularly his wife are also extremely significant. While recognizing that straight probation is not permitted under the applicable statutes, as discussed below, given the nature of the specific offense and Mrs. Carroll's healthcare issues, we respectfully request a downward variance in this case which would avoid further incarceration. (Mr. Carroll has already served multiple months in custody, which could now be followed by a term of intermittent confinement, a term of supervised release and an extended period of home confinement).

As courts across the country have recognized, the Supreme Court, through a series of decisions, has made clear that the Guidelines are not mandatory and **are not even to be presumed reasonable.** On behalf of Mr. Carroll, we ask the Court to consider the factors set out below which go beyond the cold numbers presented by the Sentencing Guidelines, and are important factors when considering an appropriate sentence pursuant to § 3553. Therefore, we respectfully ask the Court to apply a downward variance in this case to reach a non-custodial sentence (or some

intermittent confinement) with as many years of home confinement as the Court would deem appropriate. Defendant fully realizes this is a big ask, but notes that his wife's circumstances are unique.

A.     There is No Stringent Standard for Departures.

As the Eighth Circuit noted in *United States v. Weston*, 357 F. App'x 731, 732 (8th Cir. 2009), "[t]he Supreme Court emphasized that '[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also *not to be presumed reasonable.*'" *Nelson v. United States*, 555 U.S. 350, 352 (2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *Id*.

Here, Defendant is not seeking a departure per se, but a downward variance. Guidelines departures and post-*Booker* variances are different. The most significant difference is that there are "cases that would not justify a departure under the Guidelines but which are appropriate for a variance." *United States v. Myers*, 503 F.3d 676, 684 (8th Cir. 2007). "Factors ordinarily considered irrelevant in calculating the advisory guideline range, or in determining whether a guideline departure is warranted, can be relevant in deciding whether to grant a variance." *United States v. Chase*, 560 F.3d 828, 830 (8th Cir. 2009). *See also United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007) (rejecting the government's argument that a sentence was unreasonable because a variance was based "in part of some factors ordinarily considered irrelevant in calculating the advisory guideline range."). In fact, "factors that were discouraged or prohibited as departure factors under the mandatory Guidelines may be considered in connection with the § 3553(a) analysis." *United States v. Lazenby,* 439 F.3d 928, 933 (8th Cir. 2006).

The Eighth Circuit has held that the district court can even depart by variance based on factors already considered by the Guidelines. *See, e.g.*, *United States v. Overby*, 696 F.3d 702, 706

(8th Cir. 2012) ("[W]e previously have allowed variances based on factors already taken into account by the advisory [G]uidelines, where the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance.") (internal quotations and citation omitted); *Chase*, 560 F.3d at 831. ("[F]actors that have already been taken into account in calculating the advisory guideline range… can nevertheless form the basis of a variance.")

### B. The Eighth Circuit Has Recognized Family Obligations Are Permissible Factors Supporting Variances.

In *Chase*, the Eighth Circuit explained that "factors such as a defendant's age, medical condition, prior military service, ***family obligations***, entrepreneurial spirit, etc., can form the bases for a variance even though they would not justify a departure." 560 F.3d at 830-31 (emphasis added).

### C. Non-Custodial Sentences Are Intended to be Appropriate.

As the Court is well aware, and importantly here, Congress enacted 18 U.S.C. § 3553 which clearly states, "[t]he court shall impose a sentence sufficient, **but not greater than necessary**." (emphasis added). Indeed, this "parsimony provision" embodies "the overarching goal in federal sentencing." *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011). Notably, § 3553(a)'s sufficient-but-not-greater-than-necessary clause sets an independent and certain limit on the sentence that a court may impose to meet the goals of sentencing. Therefore, a home confinement sentence should be an available option in this case.

Importantly, and on point to this case, the Supreme Court in *Gall v. United States*, 128 S.Ct. 586, 596 (2007), gave strong support for sentences of probation. The Court made special note that the sentencing courts must give consideration "to the substantial restriction of freedom involved in a term of supervised release or probation." *Id*. The Court further stated that

4

"[p]robation is not granted out of a spirit of leniency .... As the Wickersham Commission said, probation is not merely 'letting an offender off easily.'" *Id*. at 595 n. 4 (quoting the Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957)). As the Supreme Court said, a sentence of probation still subjects individuals to "substantial restriction[s]" including that probationers may not leave the judicial district; change jobs without notifying (or receiving permission) from a probation officer; report regularly to a probation officer; must permit unannounced visits to their homes; and various other "special conditions" imposed on an case-by-case basis." *Id.* at 596.[1]

Following *Gall*, the Eighth Circuit had to significantly change its own view of sentences of probation/non-custodial sentences:

> The district court imposed a sentence of probation, and the government argues that the sentence is substantively unreasonable. Our precedents prior to *Gall* "routinely" rejected as unreasonable those variances that resulted in a sentence of probation when the guidelines recommend a term of imprisonment, *United States v. Soperla*, 494 F.3d 752, 755–56 (8th Cir.2007), in part because "probation is not merely a reduced sentence, but a different type of sentence altogether." *Id*. at 756 (citing 18

---

[1] Other Courts have been equally clear that a sentence of probation itself or probation combined with some period of home confinement can be an appropriately severe punishment. *See, e.g.*, *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance); *United States v. Coughlin*, Cause No. 06-20005, 2008 WL 313099 at *5-6 (W.D. Ark. 2008), (Relying on *Gall*, the Court sentenced the defendant to five years' probation, including 27 months of home confinement for fraudulent misappropriation of funds, wire fraud and filing false tax returns, noting that "[h]ome detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive."); see also *United States v. Desmond*, Cause No. 05 CR 729-4, 2008 WL 686779 at *3 (N.D. Ill. 2008) (finding that a probationary sentence which included home confinement to be "a significant restriction" on the defendant's freedom); *United States v. Howe*, 543 F.3d 128, 130 (3d Cir. 2008) (affirming downward variance from Guidelines range of 18 to 24 months' imprisonment to probation on account of defendant's role as a "devoted husband, father, and son."); *United States v. Baker*, 502 F.3d 465, 469 (6th Cir. 2007) (affirming downward variance from Guidelines range of 27 to 33 months' imprisonment to probation because of defendant's role in caring for his ill son); *United States v. Husein,* 478 F.3d 318, 335 (6th Cir. 2007) (affirming a "99.91% variance" to probation because defendant shared responsibility with his mother for caring for his father); *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation);

5

> U.S.C. § 3561; USSG § 5B1 (intro. comment.)). The Supreme Court in *Gall*, however, emphasized that "[o]ffenders on probation are subject to several standard conditions that substantially restrict their liberty," 128 S.Ct. at 595, and affirmed a sentence of probation for a drug trafficker with an advisory guidelines range of 30 to 37 months imprisonment. **The Court also indicated that a sentence of probation would be permissible for a drug trafficking offense with a guidelines range of 30–37 months' imprisonment, if there were "compelling family circumstances where individuals [would] be very badly hurt in the defendant's family if no one is available to take care of them."** *Id*. at 602 (internal quotation omitted).

*United States v. Lehmann*, 513 F. 3d 805, 808-09 (8th Cir. 2008). In *Lehmann,* the Eighth Circuit held a large variance was justified based on the need for the defendant to care for her disabled son. *Id*. at 809. *See also United States v. Bueno*, 549 F.3d 1176 (8th Cir. 2008) (variance to probation with house arrest not unreasonable given wife's illness and dependence on defendant); *United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006) (below guidelines probation sentence for 67-year-old mail fraud defendant due to "adopted adult son who suffers from fetal alcohol syndrome" for whom he is the "sole caretaker").

And variances more significant than requested by Mr. Carroll have received Eighth Circuit blessing. In *United States v. Cole*, 765 F.3d 884, 886 (8th Cir. 2014), the defendant, convicted of mail and wire fraud, tax evasion, and tax fraud of over $3 million, was facing a Guidelines range of 135-168 months, but received a downward variance to a sentence of probation. The Eighth Circuit affirmed this large variance.

### D. Downward Variances Are Commonplace.

A review of the sentencing practices of courts in the Eastern District of Missouri and across the country, as reflected in the U.S. Sentencing Commission's *Sourcebook of Federal Sentencing Statistics*,[2] demonstrates that courts now take seriously the appropriateness of sentencing below

---

[2] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/Table29.pdf.

the Guideline Range. Looking at the 2023 statistics, **over 54% of all defendants received a sentence below the Guidelines range.** Table 29, attached hereto as Exhibit 2.  While certainly some of the reduced sentences were the result of motions filed by the Government (such as §5K1.1 motions), **22% of all sentencing reductions were done by the court without support from the Government.** In the Eastern District of Missouri, 43.2% of sentences were imposed with a Downward Variance. *See* Exhibit 3 at 12 (Table 8).[3] In other words, the courts have clearly shown that they are not bound by the Guidelines or the desires of the Government.

Exhibit 3 also shows that for "Fraud/Theft/Embezzlement" type crimes, sentences in the Eastern District of Missouri have been far lower than the sentence sought by the Government here. In fact, 30% of defendants falling under "Fraud/Theft/Embezzlement" received probation. Ex. 3, Table 5, at 9. And, only five out of 104 defendants received a sentence greater than five years. Exhibit 4.[4] This appears to result from the clear recognition that under 18 U.S.C. § 3553, "[t]he court shall impose a sentence sufficient, **but not greater than necessary."**

## The § 3553(a) Factors

**A. Mr. Carroll's History and Personal Characteristics, §3553(a)(1).**

One clearly important factor for the Court's consideration is that Mr. Carroll has poured his life into caring for his wife, in a world where such exemplary behavior is far less common than we would hope. And he has shown true kindness to others as well. One of Kim Carroll's very good friends, Rebekah Boring, said the following about Mr. Carroll:

> During these time we spent together I have seen Chris be a rock for his family when Kim became ill, I have seen Chris help others with similar struggles he has had get

---

[3]    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2023/moe23.pdf.

[4]    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/stats_MOE.pdf

7

on their feet, I have seen him help needy families during the holidays, I have seen him try and help my own son when he was going through a rough patch, I have seen him help people with there passions in life, and at my past employment when we would have a need for any foster kids Chris was always willing to help. He has always been one to help anyone in need.

Frank Endicott wrote:

I've known Mr. Carroll for more than two decades and he has always helped others when they were struggling with life's challenges. From providing a homeless man with a job and a place to stay (inside the shop buildings) while he earned enough money to get back on his feet. He provided me with a job and a house to live in, as well. He was a generous boss and paid me for time while I was off work, which he didn't have to do.

Kim's son, Dane Johnson, wrote about Chris:

I have known him since I was fourteen years old, and he has not only stepped up as a father figure for me but as a caregiver for my recently paralyzed mother. Chris has always been there for me, and I know I can always call him if I need help with anything.
. . .
In the last nine years that I have known Chris, he has never let me go without anything I need. He has always made sure that my mother and I are taken care of and that I always know that I can move back home if ever needed. I hope this brings some light on how much I appreciate and look up to Chris as my stepfather.

Interviews by the FBI of former employees are also informative as to Chris' character. One employee interviewed by the FBI, Amy Defatte, stated:

CARROLL is not a monster, but he does have a vulgar, crude side. He also has a huge heart and cares about people. One time when a woman who used to work at SOG was assaulted by her husband, CARROLL gave her his credit card and told her to use it to stay at a hotel and to purchase whatever she
needed to live for as long as she needed.

Another FBI 302 states in part:

[During COVID], CHRIS CARROLL called MOUNEDJI to ask how he was doing and MOUNEDJI told him he was having a hard time. CARROLL offered MOUNEDJI $2,000 to help him out and MOUNEDJI gladly accepted. It was not clear to MOUNEDJI if the $2,000 was a gift or some form payroll, albeit drastically reduced. He really didn't care either way. He was just happy to receive the money. …. CARROLL later called MOUNEDJI a second time to ask if he was still ok and if he needed more money, which MOUNEDJI declined.

8

> When MOUNEDJI returned to work and started earning commission again, MATTHEW TITUS subtracted $2,000 from his next payroll. MOUNEDJI was furious and demanded TITUS reverse the deduction, which he eventually did.

Other letters addressed to the Court are also telling. Jason Bitticks wrote about Chris's unsolicited giving to Jason of $5000 to help care for his ailing mother. Mary Bays wrote about Chris giving her money to help her buy a car and help pay some of her electric bills. She wrote about Chris's help to a disabled child he did not even know. And, she wrote about Chris having an employee move into his home to escape domestic violence. Larry Furry wrote about Chris paying for families that could not afford the expense of travel for the community sports teams. Kelly Hotop wrote about Chris renting a hotel room for a complete stranger to keep them out of the cold.

**B.    The Nature and Circumstances of the Offense.**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 128 S.Ct. at 598 (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996); *see also United States v. Fry*, 792 F. 3d 884, 890 (8th Cir. 2015). "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) ("[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing.").

While Mr. Carroll does not intend to diminish the wrongfulness of the charges here, when viewing the specific circumstances of the PPP fraud allegations, unlike almost any other PPP case, here there were no claims of non-existent employees, there was no falsification of the dollars involved in payroll records, and there was no creation of any fictitious information. The issue of Mr. Carroll's prior conviction actually became a non-issue for the second loan because Congress told the SBA that the restriction imposed by those questions was not what Congress intended. And,

9

importantly, as testified to at trial, employees were brought back and though monies were spent on non-payroll items, an amount in excess of each loan was spent on payroll. This was not as egregious as the PPP loan frauds making the news across the country. And, as to the Clean Air Act counts, it is a reality that many of those cases, often far larger than here, are dealt with civilly.

When considering the nature and circumstances of the offense, counsel feels compelled to respond to the Government's claim made at Mr. Reed's sentencing that Mr. Carroll was far more culpable and the "originator" of the bank fraud, and that Mr. Reed's "financial ruin was solely because of Mr. Carroll." Those claims are wrong and are refuted by the undisputed facts.

As to the first application, Square One's CFO, Matt Titus, told the FBI that "[i]t was both CHRIS and GEORGE's idea to apply for the PPP loan." Doc. 60-4, July 15, 2021 302, at 3. Contrary to the Government's claim that Mr. Carroll was the "originator," even Mr. Reed's plea agreement said it was initiated "in consultation with Defendant Reed." As the Court knows from Mr. Reed's PSR, he has an MBA, and Matt Titus testified in the grand jury that " I work closely with George Reed who helps me on the finance side."  Doc. 60-15 at 5. Because of that, when the first PPP application was being prepared, as Matt Titus told the FBI, "[he] and Reed essentially prepared the application together at SOG. Chris was not involved in preparing the application." Doc. 60-4 at 3. He also told the FBI that "[h]e reviewed the application with GEORGE personally before submitting it to the bank." *Id*. On the text message trail often relied on by the Government, it is Reed who tells Matt Titus to keep Kim and Lou Ann as the owners. *See* Govt. Ex. 20 at 5-6. Mr. Carroll is not denying that he was part of the suggestion to apply for the loan, but the facts clearly show Mr. Reed was not less involved and certainly not less culpable.

As to the loan forgiveness application, Mr. Titus told the FBI, "GEORGE filled out the Forgiveness Application using financial data TITUS provided him." Doc. 60-4 at 4. He testified

10

similarly in the grand jury. Doc. 60-15 at 18-19. The application itself is signed only by George Reed, and Mr. Titus told the FBI, "[he] is not certain who actually submitted the completed forgiveness application to the bank, but assumes it was GEORGE since he prepared the application." *Id.* As to this application, there is no evidence to support any claim that Mr. Reed was less involved or less culpable. In fact, the evidence would suggest just the opposite

As to the second loan application, Mr. Titus told the FBI:

CHRIS and GEORGE asked TITUS to look into the requirements for applying for a second PPP loan. This time, TITUS ran all of the necessary payroll reports and gave them to GEORGE. GEORGE, like TITUS, is able to access SOG's financial data and may have run additional financial reports himself for the loan application.

And, as the Court will recall, the signature on the second loan application was Mrs. Reed's. And Mrs. Reed testified at trial, "If George asked me to do that, then I would have done it, but I physically don't have the recall that I DocuSigned it." Transcript Vol. 3, page 244. This cannot possibly suggest that George Reed is less culpable than Mr. Carroll.

Then as to the monies involving the second loan (the $250,000 wire transfers), Matt Titus told the FBI, "TITUS recalled being instructed by GEORGE to initiate the wire transfer." Doc. 60-4 at 5. He said the same thing to the grand jury. Doc. 60-15 at 23. And as to the $160,000 wire transfer, he told the grand jury he was instructed by George Reed. Doc. 60-15 at 20-21. The facts of this case refute any claim that George Reed was less culpable than Mr. Carroll.

Finally, as to the Government's assertion that Mr. Reed was not a part of the truck purchasing decisions, Matt Titus told the FBI, "[he] was not surprised that CHRIS asked him to purchase trucks and trailers because CHRIS and GEORGE had talked about starting a trucking business prior to the COVID pandemic." Doc. 60-4 at 4. Then, before the grand jury, Mr. Titus testified that it was George Reed who "who made the decision to wire" the first payment for any trucks. Doc. 60-15 at 14. And as to the $700,00 purchase of land, he testified that "Mr. Carroll and

11

George Reed" instructed him to make that purchase. *Id*. at 17. And, it cannot be forgotten that Mr. Reed was much more involved in the financial side of the businesses. His fingerprints are clearly on the trucking business.

Defendant realizes that he and George Reed sit in different positions. But, as to the bank fraud, Mr. Reed was, at a minimum, as culpable as Mr. Carroll. And, Mr. Reed's financial ruin cannot possibly be pinned on Mr. Carroll. Therefore, the sentences of Mr. Reed and Mr. Carroll should require significantly more equity than the Government would advocate. And, while it is true Mr. Reed cooperated with the Government, the Guidelines certainly were not intended to punish someone for exercising their constitutional right to require the Government to prove its case. *See United States v. Frost*, 914 F.2d 756, 774 (6th Cir. 1990) (observing that "it is improper for a district judge to penalize a defendant for exercising his constitutional right to plead not guilty and go to trial, no matter how overwhelming the evidence of his guilt") (internal quotation marks and citation omitted); *United States v. Saunders*, 973 F.2d 1354, 1362 (7th Cir. 1992) (it is "well established under the so-called unconstitutional conditions doctrine that a defendant may not be subjected to more severe punishment for exercising his or her constitutional right to stand trial.")

### C. Mr. Carroll Has Endured Significant Consequences Without Any Need for Additional Imprisonment.

As the Court is aware, through this litigation and others, Mr. Carroll and his wife will lose almost all their worldly possessions. It can be argued that he brought this all on himself, but nevertheless, the impact has been monumental. Importantly, the impact on his wife's health and mental well-being, as discussed immediately below, has been nothing short life threatening.

### D. Further Imprisonment Will Devastate His Wife.

One of Kim Carroll's many doctors, Scott Kirkley, MD, has stated in his letter to the Court:

> He often spent significant time studying and understanding her critical medical issues which was essential for her survival. Her medical circumstances have been

12

dire and at one point given rapid progression, there was concern for her ultimately succumbing to her illness. While she has been able to stabilize and improve to some extent, I believe this is only because Chris was there to support and provide the necessary care including emotional, psychological, and physical needs in every aspect imaginable. Despite her improvement, she will continue to need this care the rest of her life.

Another of Kim's doctors, Dr. Shayne Keddy, has stated to the Court:

Chris stayed by her side throughout this years-long crisis. He is the person solely responsible for identifying the causative agent. . . . If he is incarcerated, I fear her physical wellbeing would be severely compromised.

As one of her nurses, Linda Caudill, stated:

I have worked side by side with Chris Carroll for the past three years. The integrity in his bedside manor is (by far) the most sincere I've seen in 20 years of nursing. . . . I do have concern that, in his absence, his wife will slowly decline without the support and consistent attentive bedside manor that only he provides.

Kim's good friend, Rebekah Boring, said:

A couple of those hospital stays were so bad that the Doctors wrote her off and Chris was by her side the whole time, he did not let the Doctors give up on her. Chris learned and studied everything he could to help her. I know it was God that put Chris in her life without him she would have died. Although Kim is much better today, she still has some major health struggles, she is extreme diabetic and has no use of her lower part of her body she has lost total function in one of her arms and takes around the clock care. Chris provides this care for her every day; he makes sure every need of hers is met.

Kim herself told this Court:

At one point my doctors told my husband that my health had plateaued, and I no longer met the criteria for inpatient treatment. The doctors also stated I wouldn't last six weeks in a skilled nursing facility. Essentially, they were sending me home to die. When many spouses would have walked out Chris held me closer and refused to accept the doctors bleak prognosis, and instead began researching and learning as much as he could in order to bring me home and change my outcome. He is responsible for physical therapy and occupational therapy daily which has helped me regain the use of my right arm and very limited movement in my left arm. I am paralyzed from the breastbone down. So, Chris was fully responsible for my care, health and transfers. He meets my needs daily by preparing and serving meals, preparing and administering medication and monitoring my symptoms closely.

And, as Kim's mother has told the Court:

> He fought for and continues to fight for her in every aspect of her well being. He advocated for her in the hospital as some unknown disease attacked her body leaving her in a triplegic state. In what I thought were her final moments during Covid and all healthcare providers pushed her to the side to deal with the pandemic, Chris stayed by her side day in and day out. . . . His commitment to Kim has been above and beyond. He told me he takes his vows to her very seriously.

And most direct, Kim's sister wrote that Chris's absence "has had a profound and detrimental impact on his wife. . . Her health has significantly declined since his incarceration."

As is reflected in the December 2, 2024 medical documents from the Undiagnosed Diseases Network at Washington University Medicine, doctors are still struggling to determine how to assess and deal with Kim Carroll's debilitating health issues. And, the Clinical Indications section paints a very stark picture of Ms. Carroll's circumstances:

> Based on the submitted clinical information, the patient has progressive leukoencephalopathy, abnormality of peripheral nerve conduction, type i diabetes mellitus, chronic kidney disease, syncope, lower limb spasticity, progressive muscle weakness, diffuse white matter abnormalities, encephalomalacia, sensory axonal neuropathy, neurogenic bladder, nephropathy, hypotonia, stroke, focal t2 hyperintense brainstem lesion, cerebral infarct, small bowel diverticula, cerebral atrophy, dysarthria.

All of us can understand that the loving care of a spouse is undeniably more positively impactful on such an ill person's well-being than any other alternative. Again, Defendant realizes that he and George Reed sit in different positions. But, the Court indicated that George Reed's health was part of the reason he obtained a sentence of time served. Certainly, Kim Carroll's health considerations are more impactful than Mr. Reed's.

### E.     An Upward Variance Is Not Justified.

Defendant strenuously objects to the suggestion that an upward variance could be justified based on his criminal history. Mr. Carroll's two prior convictions date back to 1993 (and earlier)

14

when he was only 23 years old. In no way minimizing his actions back then, they do not create a significant history of violence. Moreover, the priors already increase his Guidelines calculations.

Defendant has significant concern that this Court would give any consideration to the allegations that he was part of a murder for hire conspiracy. Mr. Norman was indicted along with two other co-conspirators (not including the shooter). But, Mr. Carroll was never indicted. If Mr. Carroll was actually part of such a conspiracy, then why did he submit to hours of FBI questioning referenced in the opinion. The judicial findings that Carroll was part of the conspiracy were based only upon "a preponderance of the evidence" without Mr. Carroll having any opportunity to defend himself. There was a preponderance of the evidence because Mr. Carroll had no opportunity to offer any. This matter should have no impact on what sentence to give Mr. Carroll.

### F.     The Guidelines' Enhancements

The preliminary PSR suggests enhancements for both sophisticated means and obstruction of justice related to the alleged harassment of the Reeds sometime after Mr. Carroll would have learned that Mr. Reed proffered to the Government. The Government has stated it does not advocate any longer for the harassment/obstruction enhancement. But, this memo is due before the final PSR is filed. Neither enhancement is appropriate. Defendant refers to Doc. 485 for a full discussion as to why both enhancements are inapplicable.

### CONCLUSION

Mr. Carroll will stand before the Court a humbled man with great regret and remorse. He is well aware of the shame he has brought upon himself, the embarrassment he has brought upon his family, and the financial harm. But, there is much more good and positive about him than there is bad. As a result of this conviction he has already spent significant time confined. And, to once again state, "[t]he court shall impose a sentence sufficient, **but not greater than necessary."**

Since *Gall*, the clear mandate to a sentencing judge is to consider the "totality of the circumstances." Therefore, the generous, compassionate, uniquely personal works of charity which Mr. Carroll has done for years, the significant negative impact a sentence of imprisonment would have on his wife, the pain and repercussions he has already suffered, and the other factors within § 3553, fully support and fully justify an extended sentence of home confinement.

Dated: February 4, 2025		Respectfully submitted,

**DOWD BENNETT LLP**

By:	*/s/ James G. Martin*
	James G. Martin, #33586MO
	James B. Martin, #70219MO
	7676 Forsyth Blvd., Suite 1900
	St. Louis, MO 63105
	Telephone: (314) 889-7300
	Facsimile: (314) 863-2111
	jmartin@dowdbennett.com
	jbmartin@dowdbennett.com

	*Attorneys for Defendant Christopher L. Carroll and Whiskey Dix*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 4, 2025 a copy of the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system on all counsel of record.

		*/s/ James G. Martin*

16